# United States Court of Appeals
# for the Fifth Circuit

United States Court of Appeals
Fifth Circuit

**FILED**

July 13, 2022

Lyle W. Cayce
Clerk

No. 20-30744

United States of America,

*Plaintiff—Appellee*,

*versus*

Neguel Alfonso Morris,

*Defendant—Appellant*.

Appeal from the United States District Court
for the Western District of Louisiana
USDC No. 2:19-CR-163

Before Dennis, Higginson, and Costa, *Circuit Judges*.

Per Curiam:

In this criminal appeal, the defendant, Neguel Morris, presents two issues. First, whether evidence discovered after a consent search of Morris's car should be suppressed because law enforcement stopped Morris without reasonable suspicion or overbore his free will to obtain consent to search his vehicle. Second, whether at sentencing the district court erred in holding that Morris was ineligible for a minor role adjustment because the other participants in the crime had not been indicted or otherwise identified.

We are convinced that the sheriff's deputies in this case effected a

No. 20-30744

stop of Morris under the Fourth Amendment. Because the district court held that Morris was not stopped, it did not determine whether the deputies had reasonable suspicion to do so. This is a determination that the district court must make in the first instance, as it usually involves assessing the credibility of witnesses and weighing this evidence under the totality of the circumstances. We therefore VACATE the district court's denial of Morris's motion to suppress and REMAND for reconsideration of his motion to suppress in light of this opinion. Because this decision, by the terms of Morris's plea agreement, permits Morris to withdraw his guilty plea, and thus vacate his conviction, we DISMISS the appeal of Morris's sentence without prejudice such that he may reinstate the appeal of his sentence should he elect to maintain his guilty plea.

## I.

In August 2018, Morris began a drive from South Texas to the East Coast with a kilogram of heroin. Late one night, Morris stopped at the Wagin' Cajun Truck Stop outside Lake Charles, Louisiana. He parked his rental car in a dark lot behind the truck stop casino among several large trucks and went to sleep in his car. Two uniformed deputies with the Calcasieu Parish Sheriff's Office noticed Morris's car while on foot patrol in the area. As they began to walk towards his car, Morris started to drive away. One of the deputies flagged Morris down and Morris stopped. After asking Morris a few questions, the deputy took his driver's license to confirm his identity and check for any open warrants. Shortly thereafter, two more deputies walked up and joined the other two at Morris's car. After roughly two minutes of questioning, one of the deputies asked Morris to step out of the car. Morris complied, and the deputy began a new round of questioning.

"Here's the deal man," he told Morris, "We're trying to make sure there is no illegal activity here. This is a high drug area. The more you

cooperate, the faster you cooperate, the faster we'll be done and let you go about your way." The deputy asked Morris if he had been drinking, doing any drugs, or breaking into any trucks. Morris replied in the negative, and the deputy again advised him, "The more you cooperate, the faster we get done." The deputy's questioning then turned to searching Morris. He asked Morris for consent to search his person and his car. When Morris agreed only to a personal search, the deputy asked again for consent to search his car. Morris declined, saying there was nothing in the car. The deputy asked a third time and Morris responded by asking if the deputy had a warrant. He said he did not need one if Morris would give his consent. Morris started to respond, "There is nothing, I'm not doing nothing" but the deputy cut him off. "I already explained to you dude . . . This is a high drug area . . . We just want to make sure you're not up to any type of shenanigans or shit. Like I said, the more you cooperate, the faster you cooperate, the faster we'll be done with this. So, can we search your car?" Morris paused and said there was nothing in his car and that he was just trying to get some sleep. The deputy then said "If you want to go back to sleep, let us…people who are innocent don't—" Appearing exasperated, Morris then opened the back door of his car and said the deputies could conduct their search.

After a brief search, the deputies discovered a glass pipe and a duct-taped package of about one kilogram of heroin. A grand jury indicted Morris on one count of possession with intent to distribute a kilogram or more of heroin. Morris moved to suppress the evidence and a magistrate held a hearing where three of the four deputies involved in the arrest testified. The district court, adopting the magistrate's report and recommendation, denied Morris's motion. The court held that Morris had not been stopped under the Fourth Amendment because the deputies did not physically block Morris's vehicle and "nothing in the tone of the deputies or questions asked" would have made a reasonable person feel he was not free to leave. The court

stated that because there was no stop, the deputies did not need reasonable suspicion to justify their encounter with Morris. The court also held that Morris's consent to search his vehicle was freely and voluntarily given, validating the warrantless search. Shortly after his motion was denied, Morris conditionally pleaded guilty.

## II.

Our Court reviews a district court's determination whether a Fourth Amendment seizure occurred for clear error. *United States v. Mask*, 330 F.3d 330, 334 (5th Cir. 2003). We must view the evidence in the light most favorable to the prevailing party below. *Id.* at 335.

## III.

Morris sought to suppress evidence discovered in a search to which he allegedly consented. Consent typically renders a search lawful, but when given during an illegal detention the consent may not be enough to "dissipate the taint" of the Fourth Amendment violation. *United States v. Chavez-Villarreal*, 3 F.3d 124, 127 (5th Cir. 1993) (citing *Brown v. Illinois*, 422 U.S. 590 (1975)). Consent must be both voluntary and given as an independent act of free will in order to attenuate its connection with the illegal detention. *Id.* Where neither of those conditions is present, consent is "obtained by exploitation of the illegality," and evidence discovered during the alleged consent search must be suppressed. *Brown*, 422 U.S. at 600. The first of this two-pronged inquiry, voluntariness, "focuses on coercion," while the independent act of free will prong examines any "causal connection" with the constitutional violation. *Chavez-Villarreal*, 3 F.3d at 127. The threshold question, then, in determining whether this alleged consent search was constitutional is the question of whether there was a stop triggering the Fourth Amendment's protections in the first place.

## A.

The district court determined that the deputies' encounter with Morris was not a stop under the Fourth Amendment because the deputies "did not physically block[] Morris's egress," the encounter was brief, and, according to the district court, "nothing about the tone of the deputies or the questions asked would have made defendant feel he was not free to leave." This analysis failed to properly analyze several key facts in the record that are highly probative under our precedents. It also clearly erred in concluding that the deputies' questioning, which expressly conditioned Morris's release on his permitting the deputies to search his car, "would not have made [a reasonable person] feel he was not free to leave."

In its most general formulation, a stop occurs when someone submits to a governmental show of authority that would cause a reasonable person to believe that she was not free to leave. *California v. Hodari D.*, 499 U.S. 621, 627–28 (1991). Shows of authority include visual signals meant to bring a person to a stop, such as the familiar flashing red and blue lights of a police cruiser, *id.* at 628, in addition to physical obstacles like a roadblock, *Brower v. Cnty. of Inyo*, 489 U.S. 593, 599 (1989). Whether a reasonable person would, in the face of such a show, believe himself free to leave requires analyzing the totality of circumstances, including the number of officers present, and whether the tone or content of questions indicates that "compliance with the officer's request might be compelled." *United States v. Mendenhall*, 446 U.S. 544, 554 (1980).

Considering these authorities, we believe the district court erred in concluding that the deputies, who testified at the suppression hearing that they "flagged down" Morris's car, did not make a show of authority that a reasonable person would feel compelled to obey. It is unclear how the command of a visual signal from officers on foot differs materially from the

flashing lights of a police cruiser. *See Hodari D.*, 499 U.S. at 628; *Delaware v. Prouse*, 440 U.S. 648, 657 (1979) (stops "generally entail law enforcement officers signaling a moving automobile to pull over"). Additionally, motorists are required by law in Louisiana to obey any direction from a police officer, including hand signals. La. R.S. 32:56; *Landry v. State Farm Ins. Co.*, 529 So. 2d 417, 427 (La. Ct. App. 1 Cir. 1988). Once the deputies signaled Morris to stop, Louisiana law required that he do so. He was not free to continue driving away. Though little detail was provided at the suppression hearing as to how exactly the deputies "flagged down" Morris, the district court's analysis erred in focusing on whether the deputies blocked Morris's path, rather than examining whether they made a show of authority that a reasonable person would believe he was obligated to submit to. An officer's visual signal for a motorist to stop—whether made by hand or lights and sirens—is such a show of authority. Because a search or seizure must be "justified at its inception," *United States v. Brigham*, 382 F.3d 500, 506 (5th Cir. 2004) (en banc), for the purposes of the Fourth Amendment the stop occurred, and sufficient cause was required, when the deputies flagged Morris down.

Independently of this error, the district court made two additional errors in analyzing whether the deputies effected a stop in their encounter with Morris. First, the district court appears not to have considered whether the deputy's order for Morris to exit his vehicle converted this encounter into a stop. We have held in similar circumstances that an officer's order to exit a vehicle initiates a seizure. *See United States v. Hill*, 752 F.3d 1029, 1033 (5th Cir. 2014). Under the Fourth Amendment's "free to leave" test, it is hard to conclude that a person ordered to a certain location by police would feel free to leave. *See also United States v. McKinney*, 980 F.3d 485, 491 (5th Cir. 2020) (seizure occurred when police ordered woman walking away from officers to return). Failure to consider this key fact was also error.

Second, the district court clearly erred in concluding that "nothing about the tone of the deputies or the questions asked would have made [Morris] feel he was not free to leave." We can find no facts in the record to support this conclusion, only those that clearly show the opposite. The deputy interrogating Morris repeatedly conditioned Morris's release on his compliance with the deputy's demands. The deputy told Morris four times during the encounter that the more Morris's cooperated, the sooner the deputies would let him go. Put another way, Morris was not free to go until he cooperated with the deputy's demands. It is not clear how the district court could conclude from this that a reasonable person in Morris's position would feel free to leave. Both the express terms of the deputy's demand and the fact that he repeated it multiple times in response to Morris's hesitations suggest inescapably that "compliance with the officer's request might be compelled." *Mendenhall*, 446 U.S. at 554; *see also Hamilton v. McLemore*, No. 2:19-CV-47, 2021 WL 3719559, at *7 (S.D. Miss. Mar. 31, 2021) (finding seizure where officers told witness she could not leave because "we just need to do what we gotta do" and when witness said she was going home, officers stated "[n]ot yet you're not, not until we release you").

The district court erred in concluding there was no stop under the Fourth Amendment when the deputies "flagged down" Morris. The district court also erred in failing to consider whether the deputies effected a stop when they ordered Morris out of his car and told him he was not free to leave until he cooperated with their demands to search his car.

## B.

The fact that Morris was stopped changes the analysis. If the deputies stopped Morris without reasonable suspicion of criminal activity, they violated the Fourth Amendment. *Terry v. Ohio*, 392 U.S. 1, 27 (1968). If they violated the Fourth Amendment, that may have tainted the consent Morris

ultimately gave for the search. *Chavez-Villarreal*, 3 F.3d at 127. And if there was no valid consent, the evidence discovered in that search must be suppressed as fruits of the poisonous tree. *United States v. Jenson*, 462 F.3d 399, 408 (5th Cir. 2006).

But it is not the place of our court to decide in the first instance the key issue of whether there was reasonable suspicion for the deputies' stop. Reasonable suspicion is a fact-intensive inquiry, and in our judicial system the district court is the superior factfinder. *Ornelas v. United States*, 517 U.S. 690, 699 (1996). The Supreme Court has made clear that the initial reasonable suspicion determination should be made by the "resident judge," that is, the trial court of first instance, and the courts of appeals must give "due weight" to that court's "factual inferences." *United States v. Arvizu*, 534 U.S. 266, 273–74 (2002) (quoting *Ornelas*, 517 U.S. at 699). This primacy of the district court is especially critical here, where the principal evidence of the circumstances of the deputies' stop was the testimony of the deputies themselves. The district courts are uniquely positioned to analyze the credibility and weight of witness testimony. *See United States v. Gibbs*, 421 F.3d 352, 357 (5th Cir. 2005) ("One of the most important principles in our judicial system is the deference given to the finder of fact who hears the live testimony of witnesses because of his opportunity to judge the credibility of those witnesses.") (quoting *Louis v. Blackburn*, 630 F.2d 1105, 1109 (5th Cir. 1980)).

The Government argues that the deputies had reasonable suspicion even on the facts adduced at Morris's suppression hearing. It points primarily to the fact that Morris was parked in an area of the truck stop where trucks usually park. The principal evidence supporting the proposition that cars do not typically park in this area of Wagin' Cajun is that the deputies, drawing on their experience patrolling the truck stop, said so. But as mentioned above, determining the credibility and weight of this testimonial

evidence falls first to the district court.  It is not beyond peradventure that this testimony could be seen as lacking credibility considering the deputies also testified that they did not believe they would be justified in stopping Morris.  Nor is it impossible that this evidence would fail to carry much weight in light of the other evidence that Morris parked in an arguably reasonable location, near the entrance to the truck stop.

The cases the Government cites also do not convince us that there would be reasonable suspicion no matter how the district court weighed this evidence.  In *United States v. Gutierrez-Parra*, cited in the Government's brief, officers observed a FedEx tractor trailer pull into a vacant car wash and body shop late at night, followed by a white minivan.  711 F. App'x 752, 753 (5th Cir. 2017).  The officers "became suspicious of the truck and minivan because all nearby businesses were closed, and [they] had never seen a FedEx truck in that area at that hour."  *Id.*  Thus, it was not only that the FedEx truck was "out of place," but also that the truck was likely not there for a legitimate reason given that all the businesses were closed.  Morris's decision to park at an open business, near an entrance to that business, is not as inexplicable as the FedEx truck's decision to park in a vacant car wash late at night when all the nearby businesses were closed.

The Government also points to a recent decision from our court, *United States v. Flowers*, 6 F.4th 651 (5th Cir. 2021).  There, police officers surrounded a car parked in a convenience store parking lot because the occupants did not leave to go into the store after "10–15 seconds" of observation. *Id.* at 654.  The court stated that the defendants' location at this parking was lot was "determinative," not because it was an unusual place for them to be, but rather because it was at the "exact streets" where the officers had made a series of arrests for "recent violent crime[s] and burglaries." *Id.* at 656, 654.  Indeed, the fact that there were recent arrests at that location had to be determinative for the *Flowers* court, as a location's general status as

a high-crime area is not enough to justify a stop under the Fourth Amendment. *Illinois v. Wardlow*, 528 U.S. 119, 124 (2000). Though the deputies did testify that Wagin' Cajun was a high crime area, there is no evidence in the record of a recent spate of crimes at the casino truck stop or other specific reasons to suspect cars parked in the truck area may be up to no good. Without this "determinative" fact, *Flowers* does not control. The district court, whose institutional capacity for factfinding is superior to ours, must make the initial determination whether there was reasonable suspicion to stop Morris.

*        *        *

The district court clearly erred in determining that no Fourth Amendment stop occurred when the deputies flagged down Morris's car, or when they ordered him to get out and told him that his release depended on his cooperation in allowing them to search his car. We therefore VACATE the district court's denial of Morris's motion to suppress and REMAND for the district court to determine, consistent with this opinion, whether this stop and subsequent search complied with the requirements of the Fourth Amendment.